Madden, Judge,
delivered the opinion of the court:
Sales Contract Branch, Quartermaster Supply Section, Utah General Distribution Depot, Ogden, Utah, an installation of the United States Army, invited bids on a quantity of surplus property, designated as “Pads, filter, gas mask, wool and resin, weather damaged, new, approx. 418,800 each, *46 D-2.” One Michael King of Philadelphia bid $21.15 for the lot, which consisted of some fifteen tons of material. His bid was accepted by A. J. Bybee as Contracting Officer, and he was on June 28, 1948, mailed a copy of the contract, a request for payment of the balance of $6.15, and a direction to remove the property or furnish shipping directions within ten days. On July 2, King sent the $6.15 and requested information as to whether there was in Ogden a trucking company that he might get to pick up and store the property, if he should desire to leave it in Ogden. He also said that if he decided not to store it there he would telegraph shipping instructions immediately upon being advised of its gross weight.
On July 7, the contracting officer advised King that the gross weight was approximately 29,316 pounds and named a storage company in Ogden. On July 10, King advised the contracting officer that he was sending the storage company an authorization to pick up the property. King apparently changed his mind, because on August 20 he requested the contracting officer to ship the goods to him at Philadelphia by rail. Pursuant to that request, the Army’s transportation agent at the depot delivered the goods to the Union Pacific Railroad and they were carried by that and other connecting railroads, the last one being the plaintiff, the Reading Company, to Philadelphia. The bill of lading was a regular commercial bill of lading, signed by the Army’s Transportation Agent, as such agent, as consignor. The shipment was, of course, a “collect” shipment. The agent executed the “nonrecourse clause” of the bill of lading, the text of which appears in finding 7.
Upon the arrival of the goods in Philadelphia, the plaintiff railroad on September 13 notified King of the arrival and of the amount of the freight charges, $1,866.29 plus tax. On September 21, King wrote the railroad that he would not be able to take up the shipment “due to the high freight charges.” The plaintiff then telegraphed the Army’s Transportation Agent at Ogden telling him that the consignee had refused the shipment and asking what disposition should be made of it. The Army’s Chief of its Transportation Branch at Ogden suggested that plaintiff have King certify that the *47 material was to be used as scrap rags and thus get a lower freight rate. In the meantime, at plaintiff’s request, the proper authorities did reclassify the material as “filters” which classification reduced the freight charges to $1,254.58 plus tax.
The plaintiff notified King, and the Army at Ogden, of the revised charges; notified King that the goods would have to be sold unless the charges were paid within a few-days; and requested the Army to advise what disposition should be made of the goods. On October 9, King requested the plaintiff to dispose of the goods. On October 16, the Army advised the plaintiff that the transaction concerned only the plaintiff and King, and not the Army.
After due advertising, the plaintiff sold the goods on January 5, 1949, at public auction for $Í93.20. On March 8 and May 12,1949, the plaintiff sent bills to King for $1,378.21, which was the amount of the freight, demurrage and expenses of sale less the amount received at the sale. He did not pay. On June 9, the plaintiff billed the Army, but the answer was again that the transaction was between the railroad and King. King, on September 7, 1949, wrote the plaintiff that he had acted in the transaction as the agent of the Columbia Waste Material Company. This statement was not true.
The plaintiff persisted in its claim that the Government was liable for the charges. The Army referred the matter to the General Accounting Office, but the claim has not been paid. The plaintiff again reduced the freight rate, this time to $875.09, which, together with the additional charges for demurrage, advertising, etc., and less the amount received on the sale of the goods, leaves a balance due the plaintiff of $966.63.
The Government concedes that, ordinarily, one who ships goods to a consignee, “collect,” is liable for the freight charges if the consignee does not pay them. It says that it was not the shipper; that a man named Vard L. Hurst, who just happened to be the Transportation Agent of the Army’s depot, shipped the goods as a personal accommodation to King, the purchaser. But this was not the fact. When the Government’s contracting officer awarded the contract to *48 King, he directed King to furnish shipping directions, if he wanted the goods shipped. He did not say that if he got such directions he would try to find some person around the installation who would be willing, on the Government’s time and with the Government’s facilities, to personally accommodate King, of whom this person had never even heard, by shipping the goods for him. The contracting officer meant that the Government, which had sold the goods to King, would do what sellers usually do when they sell goods to people in distant places, i. e., ship the goods to them. Hurst, as Transportation Agent for the Government, signed the bill of lading in the same way that he signed all other bills of lading for shipments made by the Government.
The Government urges that its agent’s execution of the “nonrecourse clause” made the Government immune from liability for the freight charges. This contention is not well-founded. The nonrecourse provision is:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.
This means that if the carrier waives its lien for the freight charges, which lien is usually adequate security for them, by surrendering the goods without collecting the charges, the shipper will no longer be liable for the charges. Here the plaintiff railroad did not surrender the goods, and the non-recourse clause had no application or effect.
The Government argues that the plaintiff billed King for more than the lawful freight charge and thereby forfeited its right to hold the property and was guilty of a conversion when it sold the property for the freight charges. It will be remembered that the plaintiff first billed King for $1,866.29 plus tax. King replied that he was unable to take up the shipment “due to the high freight charges.” He did not complain that the charges were improper. Later the plaintiff on its own motion changed the classification of the goods and reduced the charges to $1,254.58 plus tax, but King still did not pay them. After the goods were sold the plaintiff reduced the charges to $875.09, apparently the charges applicable to scrap rags, which reduction King could, it seems, *49 have obtained at any time by certifying that the goods would be used as scrap rags.
The fact seems to be that when King’s hope of quickly reselling the goods to the Columbia Waste Material Company was disappointed, he was unwilling to pay $1,866.29 or any other large sum to obtain possession of the $21.15 worth of goods he had purchased. The erroneous classification of the goods and the consequent overcharge of freight was not the reason for King’s failure to pay the charges. And even if there had been a wrongful conversion, which there was not, there is no evidence that the goods were worth more than the plaintiff obtained for them by its sale at public auction.
The Government has filed a contingent claim against the Columbia Waste Material Company, and against King, asserted to be the agent of the Columbia Company, asking that if any judgment be rendered in favor of the plaintiff and against the Government, a judgment for the same amount be rendered in favor of the Government against Columbia and King. As to Columbia there is no evidence that King was its agent in the transaction or that Columbia was involved in any way in the transaction. The Government’s claim against Columbia is therefore dismissed. King, by his direction, was the consignee of the goods, and, as between him and the Government, was obligated to pay the freight.
The plaintiff may have a judgment against the United States for $966.63. The United States may have a judgment for the same amount against King.
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
EINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a domestic corporation organized and existing under the laws of the Commonwealth of Pennsylvania, is engaged in interstate commerce as a common carrier by railroad of passengers and freight. Its principal office is in Philadelphia, Pennsylvania.
*50 2. Upon motions made by the defendant and allowed by the court, Mr. Michael King and Columbia Waste Material Company, both of Philadelphia, Pennsylvania, were made parties to this proceeding. Columbia Waste Material Company is a corporation engaged in the buying and selling of surplus and waste textile material, particularly wool. Mr. King buys and sells merchandise of any kind.
3. On June 28, 1948, the defendant, represented by the Quartermaster Supply Section, Utah General Distribution Depot, United States Army, at Ogden, Utah, sold to Michael King, trading as Aaton Company, P. O. Box 9336, 5719 Addison Street, Philadelphia, Pennsylvania, one lot of surplus filter pads, later designated to be wool filters, for the price of $21.15. The purchase price for the filter pads was paid to the defendant by Mr. King on July 7, 1948. Title to the filter pads passed to the purchaser on payment of the purchase price. The Aaton Company was the trade name of a single proprietorship of which King, contingent defendant in this action, was the principal.
4. Mr. King tried unsuccessfully to sell the materials he had purchased to someone in Ogden, Utah. On or about August 15, 1948, he spoke to Mr. Nathan Goldberg, President of the Columbia Waste Material Company, and attempted to negotiate a sale of the lot of wool filters. No details were agreed upon as to price, delivery, freight or quantity, although based on the samples shown by King, Mr. Goldberg of the Columbia Company expressed interest.
5. Mr. Vard L. Hurst, as the Transportation Agent of the Salvage Branch of the Utah Distribution Depot, United States Army, Ogden, Utah, at the direction of his superiors who were acting at the request of King to ship the filters by railroad to the Aaton Company, Philadelphia, delivered to the Union Pacific Company the lot of surplus property consisting of wool filters.
6. Pursuant to the bill of lading, the Union Pacific Company, and its connections, Missouri Pacific Railroad Company, Pennsylvania Railroad Company, and the plaintiff, in August 1948, transported one carload of the surplus property in car RI-25361 to Philadelphia. The property was shipped under commercial bill of lading (Union Pacific *51 Waybill No. UP-883) with Aaton Company, Philadelphia, as consignee.
7. The nonrecourse clause of the commercial bill of lading was executed by Hurst, in his capacity described in finding 5, as consignor. The clause read as follows:
Subject to Section 7 of Conditions, if this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement : The carrier shall not make delivery of this shipment Avithout payment of freight and all other lawful charges.
Section 7 of the terms and conditions of this uniform bill of lading is as follows:
Sec. 7. The owner or consignee shall pay the freight and average, if any, and all other lawful charges accruing on said property; but, except in those instances where it may lawfully be authorized to do so, no carrier by railroad shall deliver or relinquish possession at destination of the property covered by this bill of lading until all tariff rates and charges thereon have beeni paid. The consignor shall be liable for the freight and all other lawful charges, except that if the consignor stipulates, by signature, in the space provided for that purpose on the face of this bill of lading that the carrier shall not make delivery without requiring payment of such charges and the carrier, contrary to such stipulation, shall make delivery without requiring such payment, the consignor (except as hereinafter provided) shall not be liable for such charges. Provided, that, where the carrier has been instructed by the shipper or consignor to deliver said property to a consignee other than the shipper or consignor, such consignee shall not be legally liable for transportation charges in respect of the transportation of said property (beyond those billed against him at the time of delivery for which he is otherwise liable) which may be found to be due after the property has been delivered to him, if the consignee (a) is an agent only and has no beneficial title in said Eroperty, and (b) prior to delivery of said property as notified the delivering carrier in writing of the fact of such agency and absence of beneficial title, and, in the case of a shipment reconsigned or diverted to a point other than that specified in the original bill of lading, has also notified the delivering carrier in writing of the name and address of the beneficial owner of said prop *52 erty; and, in such cases the shipper or consignor, or, in the case of a shipment so reconsigned or diverted, the beneficial owner, shall be liable for such additional charges. If the consignee has given to the carrier erroneous information as to who the beneficial owner is, such consignee shall himself be liable for such additional charges. On shipments reconsigned or diverted by an agent who has furnished the carrier in the reconsignment or diversion order with a notice of agency and the proper name and address of the beneficial owner, and where such shipments are refused or abandoned at ultimate destination, the said beneficial owner shall be liable for all legally applicable charges in connection therewith. If the reconsignor or diverter has given to the carrier erroneous information as to who the beneficial owner is, such reconsignor or diverter shall himself be liable for all such charges.
If a shipper or consignor of a shipment of property (other than a prepaid shipment) is also the consignee named in the bill of lading and, prior to the time of delivery, notifies, in writing, a delivering carrier by railroad (a) to deliver such property at destination to another party, (b) that such party is the beneficial owner of such property, and (c) that delivery is to be made to such party only upon payment of all transportation charges in respect of the transportation of such property, and delivery is made by the carrier to such party without such payment, such shipper or consignor shail not be liable (as shipper, consignor, consignee, or otherwise) for such transportation charges but the party to whom delivery is so made shall in any event be liable for transportation charges billed against the property at the time of such delivery, and also for any additional charges which may be found to be due after delivery of the property, except that if such party prior to such delivery has notified in writing the delivering carrier that he is not the beneficial owner of the property, and has given in writing to such delivering carrier the name and address of such beneficial owner, such party shall not be liable for any additional charges which may be found to be due after delivery of the property; but if the party to whom delivery is made has given to the carrier erroneous information as to the beneficial owner, such party shall nevertheless be liable for such additional charges. If the shipper or consignor has given to the delivering carrier erroneous information as to who the beneficial owner is, such shipper or consignor shall himself be liable for such transportation charges, not *53 withstanding the foregoing provisions of this paragraph and irrespective of any provisions to the contrary m the bill of lading or in the contract of transportation under which the shipment was made. The term “delivering carrier” means the line-haul carrier making ultimate delivery.
Nothing herein shall limit the right of the carrier to require at time of shipment the prepayment or guarantee of the charges. If upon inspection it is ascertained that the articles shipped are not those described in this bill of lading, the freight charges must be paid upon the articles actually shipped.
8. The carriers, including the plaintiff, had no knowledge of the transactions, the terms and conditions of the contract of sale, or the communications between the defendant and the purchaser until after the shipment was completed. With respect to the shipment and the circumstances surrounding it, the carriers, including the plaintiff, had only the bill of lading upon which to rely.
9. An arrival notice was sent to the consignee on September 9,1948. The organization known as the Aaton Company could not be located and the arrival notice was returned to plaintiff by the postal authorities.
10. On September 11, 1948, in response to an inquiry by the plaintiff, the freight agent of the Union Pacific Company telegraphed plaintiff to contact King, who had ordered the shipment.
11. On September 13, 1948, plaintiff wrote Michael King, notifying him that car RI-25361 had arrived. It was shortly thereafter that plaintiff gave notice to Mr. Goldberg of Columbia Waste Material Company that the merchandise was available for his inspection at the siding.
12. Upon inspection of the car by Goldberg, it was discovered that the wool filters were packed and crated in wooden boxes which would necessitate such handling and labor charges as would preclude any possibility of profit on the part of Columbia Waste Material Company if it purchased the product. Inspection further revealed that the carload contained lace, masks and other discarded Government materials different from samples shown by King and different from what the Columbia Company had handled in the past. Mr. King and employees of plaintiff were *54 promptly advised tibat Columbia had no interest in the merchandise and did not intend to buy it.
13. On September 21,1948, Mr. King wrote plaintiff stating : “I won’t be able to pick Car RI car 25361 — due to the high freight charges.” This letter was on the stationery of the Aaton Company and made no suggestion that King was acting as agent for any undisclosed principal.
14. Plaintiff wired Yard L. Hurst, Transportation Agent, Salvage Branch, Utah General Depot, Ogden, Utah, on September 22,1948, as follows:
YOUR SHIPMENT RI 2 5 3 61 CONSIGNED AATON COMPANY PHILADELPHIA ON HAND DESTINATION SINCE SEPT. 9 AGCOUNT DISCREPANCY IN FREIGHT CHARGES CONSIGNEE REFUSES CAR ADVISE IMMEDIATE DISPOSITION DEMURRAGE ACCRUING RAPIDLY.
15. On the same day, Alvin Sessions, Lt. Col., T. C., Chief, Transportation Branch of Utah General Depot, Ogden, Utah, communicated with plaintiff as follows:
SUGGEST POSSIBILITY OF HAVING CONSIGNEE PREPARE CERTIFICATE CERTIFYING MATERIAL AS SCRAP RAGS AND TO BE USED AS SUCH, AND CORRECT BILLING ACCORDINGLY. BUYER UNDERSTOOD THIS MATERIAL WAS TO BE SHIPPED AS SCRAP, HOWEVER, THIS INSTALLATION HAD NO MEANS OF KNOWING HOW MATERIAL WOULD BE USED AND THEREFORE CANNOT CERTIFY SCRAP RATING.
16. The surplus property was classified for shipment as “filtering discs, cotton,” and was transported at a rate of $6.59 per cwt. The freight charges thus resulting were $1,866.79 plus tax. On September 19,1948, the Trunk Line Inspection Bureau at the plaintiff’s request inspected the contents of the railroad car in question and recommended that said surplus property be classified as “filters, NOIBN (Item 17597, consolidated freight Class No. 18),” which would yield a rate of $4.43 per cwt., or total charges of $1,254.58. Based on this recommendation the freight charges were reduced to $1,254.58 plus tax.
17. Plaintiff sent a registered letter on September 30,1948, return receipt requested, to Aaton Company, c/o Michael King, P. O. Box 9336, Philadelphia, which stated that plaintiff had not received disposition relative to the carload of wool filters and that demurrage charges were accruing very *55 rapidly. The letter also stated, among other things, that unless disposition covering the car was received in a few days, plaintiff would be obliged to dispose of the shipment at a public sale in accordance with section 4 of the contract terms and conditions of the bill of lading. The return receipt was received by Reading Company, signed “Aaton Company, Michael King.”
18. On September 30, 1948, and October 8, 1948, plaintiff wrote Lt. Col. Alvin Sessions, Chief, Transportation Branch, Utah General Depot, requesting him to advise plaintiff if he could furnish disposition of the railroad car in order that the proper charges could be collected thereon and the car returned to railroad service. The letter of September 30, 1948, also informed Lt. Col. Sessions of the reduction in the freight charges from $1,806.79 to $1,254.58.
19. A letter dated October 9,1948, was received by plaintiff from Michael King requesting plaintiff to dispose of the contents in car RI-25361.
20. On October 16, 1948, plaintiff received a letter from Lt. Col. Alvin Sessions, stating, among other things, that:
(a) The Aaton Company did furnish shipping instructions for car Rl-25361 out of Ogden, Utah.
(b) A request for a scrap certificate was made by Aaton Company, but that Aaton Company failed to sign the certification prior to the release of the car for forwarding.
(c) Therefore, the freight was classified in accordance with the description of the commodities, as set forth in the freight billing guide.
(d) Under date of August 30, 1948, Aaton Company was informed by the Utah Depot that a scrap certificate should be issued by them to the carrier in the event the material was to be used as scrap.
(e) Therefore, the transaction was between plaintiff and consignee.
Mr. King did not apply for a scrap certificate. No such certificate had been issued.
21. On January 5, 1949, in accordance with the contract terms and conditions of the bill of lading, plaintiff sold the surplus material at public auction, the proceeds from the sale being $193.20 which is the only compensation plaintiff *56 has received for shipping the property in question. In preparation for said sale, plaintiff, among other things, caused the following to be done:
(a) A notice of the public sale to be inserted in the Philadelphia Inquirer on December 21, 1948, December 28, 1948, and January 4, 1949.
(b) Fifty copies of the public sale notice to be printed and placed in the most public and conspicuous places in the vicinity of the surplus property.
(c) As stated before, on September 30, 1948, and October 8,1948, gave the consignor notice that the property had been refused and requested disposition to be arranged thereof.
22.On March 8,1949, and again on May 12,1949, plaintiff billed the Aaton Company, P. O. Box 9336, Philadelphia 39, for $1,378.21, the balance claimed due as of that time. A breakdown of this sum is as follows:
$1,254.58 — Freight charges.
6.44 — Switching charges.
188.10 — Demurrage.
43.4T — Tax.
7.00 — Printing of 75 posters announcing the public sale.
71.82 — Expense incurred by plaintiff by advertising the public sale in the Philadelphia Inquirer once a week for three successive weeks.
1,571.41 — Total.
193.20 — Proceeds of sale.
1,378.21 — Balance claimed by plaintiff.
23. A bill dated June 6, 1949, in the amount of $1,378.21 was mailed to Lt. Col. Alvin Sessions, Chief, Transportation Division, Utah General Depot, Ogden, Utah.
Plaintiff received a letter from Lt. Col. Sessions, on June 24,1949, stating, among other things, that the bill of plaintiff could not be honored as a responsibility of the Government but was a transaction between the carrier and consignee.
24. On July 7, 1949, plaintiff sent a bill in the amount of $1,378.21 by registered mail, return receipt requested, to Aaton Company, P. O. Box 9336, Philadelphia. The receipt was returned to plaintiff, signed “Aaton Company, Michael King.”
*57 25. On or about September 1,1949, plaintiff was informed that Mr. King was then living at 5719 Addison Street, Philadelphia, Pennsylvania. Therefore, on September 1, 1949, plaintiff sent a letter enclosing a bill in the amount of $1,378.21 by registered mail, return receipt requested, to Aaton Company, % Michael King, 5719 Addison Street, Philadelphia. Instructions were given to the post office to deliver only to addressee. The receipt was delivered to plaintiff, signed “Michael King.”
26. On September 7, 1949, plaintiff received a letter from Michael King stating that he acted as an agent for the Columbia Waste Material Company. The letter stated further:
Your personnel at the Oxford street freight station will verify this statement as the above-mentioned company has the freight bill and they personally inspected the car and that they were the ones that refused to accept this shipment.
This letter, one year after the carload had arrived in Philadelphia, was the first notice received by plaintiff that Michael King was allegedly the agent of Columbia Waste Material Company, an allegation of relationship which is not supported by the evidence in this case.
27. Plaintiff was diligent in informing the defendant and King of the arrival of the car before the sale of the property and diligent before and after the sale in seeking payment from both the defendant and King of the charges set forth above.
28. On October 7, 1949, the plaintiff wrote to Lt. Col. Sessions as follows:
Your letter of June 20,1949, your file QMDUZ (DT) 552.02, to the Freight Claim Department of this Company has been referred to me for attention.
Our claim against the United States Government for $1,378.21, covered by our bill 1-3484, was based on the provision in section 7 of the standard bill of lading that the consignor shall be liable for freight and all other lawful charges. We believe that the signing of the so-called “non-recourse” clause by the consignor acts to relieve the consignor of its liability for the freight charges only when the carrier delivers the goods covered *58 by the bill of lading without collecting such charges from the consignee or other person. In this case, the carrier did not deliver the shipment without the collection of freight charges. On the contrary, because the consignee failed to pay the freight charges, the goods were not delivered, and it finally became necessary for the carrier to sell the same at public auction. The net proceeds from the sale have been credited against the total charges, leaving the foregoing amount of $1,878.21 as the amount owing the carriers for the transportation services performed by them.
The foregoing claim is being made only after we exhausted all our means short of suit against the consignee. We have not entered suit because it is doubtful if we have a contractual basis to do so, since the consignee did Hot accept delivery, and also because our extensive investigations show that the consignee, Aaton Company, a trade name used by one Michael King, is without assets and the cost of bringing suit is therefore an unjustified expense. It is our further position that even should we obtain judgment against the consignee, since it would be uncollectible, the Government would remain liable.
_ In view of the foregoing, I trust that you will recognize the obligation of the United States for these freight charges, and that the same will be paid in due course.
29. Plaintiff again wrote Lt. Col. Sessions on November 16,1949, requesting an answer to its letter of October 7,1949.
Lt. Col. Sessions wrote plaintiff that the file with respect to the matter involved was forwarded to the Chief of Transportation, Washington 25, D. C., through Headquarters, Sixth Army, Presidio of San Francisco, California. This letter dated November 23, 1949, continued by stating that it was felt the matter was one which should be considered by higher echelon.
30. On November 29, 1949, plaintiff wrote to the Chief of Transportation, Department of the Army, asking, among other things, whether or not the United States Government would accept a bill for these charges. On December 6,1949, reply was made requesting a copy of the bill of lading reference so that the case might be handled properly. This was furnished. Additional letters were exchanged requesting and submitting additional information. Finally, on May 2, 1950, the Chief of Transportation, Department of the *59 Army, advised plaintiff that a review of the claim was about completed and it would be forwarded to the General Accounting Office for direct settlement. No part of it, however, has been paid by the consignee or the defendant.
31.The following is a breakdown of the amount now in controversy reflecting adjustments allowed by plaintiff in its previous computations of freight charges and taxes:
$875. 09 — Freight charges.
6. 44 — Switching charges.
188.10 — Demurrage.
11.88 — Tax.
7. 00 — Printing of 75 posters announcing the public sale.
71.82 — Expense incurred by plaintiff by advertising the public sale in the Philadelphia Inquirer once a week for three successive weeks.
1,159. 83 — Total.
193.20 — Proceeds of sale.
966. 63 — Balance claimed by plaintiff.
32. Mr. King does not deny liability to plaintiff for the shipping charges. He has, however, taken the position that if the court holds the defendant Government liable that such defendant is entitled to an equal judgment against him and that in turn he has a recourse upon Columbia Waste Material Company. This is also the position of the defendant Government. No action of any sort has ever been instituted by King, individually or trading as Aaton Company, against Columbia Waste Material Company nor by plaintiff against King or Columbia. Plaintiff insists that both the Government and King are obligated to pay but that the Government should do so and then be subrogated to plaintiff’s right to recover from King.
33. King was not an agent of Columbia Waste Material Company nor was there any ratification or adoption of his acts by that company in connection with the purchase or shipment of the materials involved here. King was at all times acting on his own behalf. The relationships between the defendant Government and the contingent defendants Michael King and Columbia Waste Material Company were all unknown to the plaintiff at the time of shipment.
*60 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is entitled to recover against the defendant Government in the amount of nine hundred sixty-six dollars and sixty-three cents ($966.63). The Government is entitled to a judgment in the same amount against the third party defendant Michael King.
The Government’s contingent claim against Columbia Waste Material Company as a third party defendant is dismissed.